STATE OF MAINE

KENNEBEC, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AD-02-001

DHM - KEN - 3/06/2003

MAINE STATE BOARD OF NURSING,
*et al.*,

       Plaintiff

v.

PATRICIA E. LANNING, R.N.,

       Defendant

DONALD L. GARBRECHT
LAW LIBRARY

MAR 31 2003

DECISION AND ORDER

This matter is before the court on complaint of the Maine State Board of Nursing ("Board") and the State of Maine through its Attorney General seeking to suspend or revoke the professional nursing license of the defendant pursuant to 32 M.R.S.A. § 2105-A(1-A)(E). In accordance with such statutory authority, the complaint was filed with the Administrative Court. Upon the termination of the Administrative Court, the matter was placed within the jurisdiction of the District Court. By his order of February 25, 2002, the Chief Judge of the Maine District Court, in accordance with Administrative Order No. JB-01-01 of the Maine Supreme Judicial Court, ordered the action transferred to the Maine Superior Court. By her order of March 11, 2002, the Chief Justice of the Maine Superior Court transferred the matter to the Kennebec County Superior Court.

This court, sitting as an Administrative Court, held a hearing on December 16, 17 and 18, 2002, and received written briefs post-hearing.

In its complaint, the Board alleges that the defendant, on March 12, 1999, while employed as a registered nurse at the MaineGeneral Medical Center, failed to provide an adequate assessment of a patient's condition, failed to adequately report that patient's symptoms to the responsible physician, and failed to provide nursing

documentation that was pertinent, precise and accurate reflecting the patient's condition. Upon report of the incident by the hospital to the Board, the Board scheduled an informal conference at which the defendant voluntarily surrendered her registered nurse license pending the outcome of a complaint in this matter to the Maine Administrative Court for a possible suspension or revocation of her nursing license. The complaint requests the Administrative Court to find that the defendant is incompetent to practice professional nursing within the meaning of the statute (32 M.R.S.A. § 2105-A(2)(E)(1)), declare the defendant engaged in unprofessional conduct within the meaning of the statute (32 M.R.S.A. § 2105-A(2)(F)), and declare that defendant has violated laws and rules governing the practice of nursing contrary to statute (32 M.R.S.A. § 2105-A(2)(H)).

On February 3, 1999, F.N. consulted with a doctor for various physical and emotional problems. She had not seen a regular primary care physician for about four years. She complained that she was feeling very poorly and was tired all the time. The probable diagnosis from that first visit was recurrent depression and the doctor suggested various tests for her medical problems, including the source of her fatigue. Numerous visits to the doctor took place in the following days including a visit to the Emergency Room of the MaineGeneral Medical Center on March 7, 1999, where she was diagnosed with labyrinthitis, acute ear infection, appropriate to her symptoms of dizziness and for which she was given medication including an antiemetic for nausea.

On March 9, 1999, she returned to the Emergency Room reporting increased congestion and nasal drainage. Appropriate diagnostic testing found elevated liver functioning which the doctors reported could have been associated with a viral infection. There also was a report of loose stools. On March 10, 1999, she was admitted to the psychiatric ward of the MaineGeneral Medical Center at its Seton Unit for

treatment for her depression. The history and physical examination by her medical doctor contained an assessment/plan diagnosing, among other things, major depression and "probable recent viral illness with some labrynthitis and possible sinusitis," a continuation of the acute ear infection reported to the Emergency Room on March 7.

On the morning of March 12, 1999, F.N. met with the hospital psychiatrist, a counselor, and participated in group therapy. Shortly before noontime, the unit psychologist met with her in her hospital room where they discussed the conditions behind her depression. When F.N.'s roommate returned to the hospital room, the psychologist and F.N. agreed to move to his office to continue the interview.[1] On the way from her hospital room to the psychologist's office, F.N. complained of dizziness and unsteadiness but she assured the psychologist that she could make the walk on her own unassisted. As soon as F.N. and the psychologist arrived at his office, she complained that the headaches which she had reported earlier in her admission were getting worse and she was feeling sick. When asked by the psychologist if he could be of assistance, she asked for ice water and put her head in her hand. The psychologist left the office and obtained the ice water and, at the same time, contacted a mental health worker, who was a CNA, to help get the patient back to her room as the psychologist was concerned about her medical complaints. They were soon joined by the defendant. At some point before the CNA arrived, F.N. slowly slid from her chair down to her knees. As she slid out of the chair, she had her chin on her chest, was holding her head and saying, "my head, my head" many times. At this point, the defendant had arrived and asked F.N. if she needed help, but there was no response

---

[1] From this point on in the chronology of events, there is a great deal of disagreement over the details of occurrences. Without discussing all of the disagreements, the court's narrative is based upon what it believes most probably took place..

and she continued her downward move lying on the floor, rolling over on her side, and vomiting. Defendant inquired of the psychologist and the CNA as to what happened and the previous events were described. It is important to note that the psychologist, in describing the previous events which occurred outside the presence of the defendant, did not mention the complaints by F.N. of her headache. The CNA, when first inquired during his testimony, stated he was not sure what he told the defendant. At a later time in his cross-examination, he had a recovery of memory and stated that he did tell the defendant that F.N. had held her head and complained "my head." Given all the evidence of the incident up to this point provided to the court by the testimony and the exhibits, it is not satisfied that it is more likely than not that Mrs. Lanning was told that F.N. had grasped her head in her hands and complained of a severe headache.

At this point, the defendant checked the pulse of the patient, who got less and less responsive, and was gagging. The CNA left the room and obtained a wheelchair. Shortly thereafter, the unit psychiatrist arrived, made inquiries, and assisted the CNA and the defendant in putting F.N. in the wheelchair. According to the psychologist, at the point the psychiatrist arrived in his office, the patient's eyes were still open. While it is somewhat disputed whether the patient physically assisted the parties in that placement, the court finds more likely than not that she did not provide assistance. In the words of the CNA, "she was out of it." As the CNA and the defendant were wheeling F.N. back to her room, the patient further vomited, was resting her chin on her chest, and was unresponsive. The psychiatrist ordered an antiemetic be administered to the patient to address her nausea and vomiting, which was done shortly thereafter. It is agreed that the medication, Phenergan, a medication for nausea, may have a sedative effect, depending upon the patient.

4

At the time the defendant returned the patient to her bed, there is disagreement as to whether F.N. assisted in her placement from the wheelchair to the bed. At any rate, the medication was administered and she was left to sleep. At this point, it appears that the defendant assumed from the circumstances that the patient was asleep. She was aware of F.N.'s history of dizziness, nausea, headaches, diarrhea, and exhaustion. Further, it had been suggested by the psychiatrist that the patient needed to sleep and the defendant assumed that the sedative effect of the Phenergan was taking place.

The patient assignment document for that shift in that unit as prepared by the charge nurse placed F.N. under the direct responsibility of the charge nurse. While there is no documentation of any amendment to that assignment list, the charge nurse testified that she told the defendant to watch F.N. and the defendant responded, "okay." On the assignment list, defendant had three patients for which she was specifically responsible, was responsible for administering medications to all patients, was responsible for taking glucose samples, and would be the ward nurse responsible for responding to a code 99, a medical emergency elsewhere in the Seton Unit.[2] The issue of assignment is not necessarily relevant to the responsibilities placed upon the defendant on that day, but it does explain a routine habit contributing to the problems of nursing care. In each of the proceedings, the defendant insists that she reported to the charge nurse with the expectation, among other things, that the charge nurse would take care of all documentation of the patient's assigned to her. Furthermore, upon the request by the psychiatrist that the staff notify the primary care physician of the medical

---

[2] Both the charge nurse and the defendant complain of the workload and the lack of response by the hospital to request for assistance. Hospital officials deny the understaffing and the lack of responsiveness. Whether that is true or not, it does not seem to have a substantial causative effect on the only concern of this court, the behavior of the defendant, but it does note that as a corrective measure, the patient-to-staff ratio was reduced.

incident, the defendant relied upon the charge nurse to perform that function because of the assignment. This lack of documentation, extraordinarily deficient in this instance, may well have been a systemic problem. Regardless, it resulted in a great deal of notations made after the death of the patient and creating serious questions of credibility with regard to accuracy. There was documentation of vital signs taken at 12:00 noon, 6:00 p.m., and 7:15 p.m on March 12, 1999, as they had been entered into the computer. At least as to the noon and 6:00 p.m. entries, they were made by the defendant. These include glucose tests.[3]

It would appear about a half hour after F.N. was placed in her bed, she again vomited. She and her clothes were cleaned. At 2:00 p.m., the defendant noted that F.N. had become incontinent of bowels. This required the defendant and the charge nurse to remove the patient's clothes, clean the patient, including private areas, and change the bedclothes. During this entire process, the patient was completely unresponsive, as she had been unresponsive to the glucose test procedure, and the only observation made was by the charge nurse that F.N. made a slight snoring sound as she was being repositioned.

At 6:00 p.m., the defendant noticed that the patient's head was turned and she straightened F.N. in the bed. The defendant still believed that F.N. was sleeping, she believed the patient looked comfortable, and at no time, during the entire period of noon to the end of her 12-hour shift at 7:00 p.m., did she do any neurological assessment.

A team meeting had been scheduled for 3:00 p.m. on the afternoon of March 12. This was to involve F.N., the psychiatrist, other staff, and F.N.'s family members. When

---

[3] Glucose tests are performed by taking a sample of blood. This involves a stab of the finger sufficient to draw blood for testing. It is a significant neurological stimuli.

F.N.'s daughters arrived for that meeting, they were advised that F.N. was sleeping, that the psychiatrist had suggested she not be wakened and that they would have the team meeting without the patient. The daughters visited F.N. in her room and became concerned as to her condition. The patient was entirely unresponsive, and, according to one daughter, was pale, sweating, and appeared to have a slight twitch. Upon stating those observations to the psychiatrist, it was suggested that she was simply exhausted, sleeping off the sedative, and would certainly be awake if they returned at 6:00 p.m. In order to address their concerns, the psychiatrist did advise the daughters that she would order a CAT Scan but she advised that there was no need to do so on an emergency basis.

Around 6:00 p.m., the daughters did return and found their mother in the same condition. At this point, they became very agitated and emphatically complained to staff. There is no evidence that they had any communication with the defendant. Shortly thereafter, a change in nursing shifts took place at 7:00 p.m. In response to the complaints, the new charge nurse ordered a nurse to visit F.N. and take all vital signs, including a neurological assessment. Upon doing so, the staff realized that the patient had suffered a serious intercerebral accident exhibited by a high level of unresponsiveness, lack of response to painful stimuli, and depletion of the dilation capability of the eyes. Upon consultation with medical physicians, arrangements were made for an immediate transfer of the patient by ambulance to the Emergency Room. A CAT Scan was accomplished, a deep hemorrhage was found, and a determination made of damage too advanced to warrant surgical intervention or extraordinary measures. F.N. died shortly before 5:00 a.m. the following morning.

It should be noted that there were at least two communications with the primary care physician during the course of the afternoon of March 12. While it is unclear what

7

was told the physician, it appears that the conclusion arrived at was that the incidents were a reflection of the previous medical condition. The only additional procedure ordered was for the nursing staff to listen to bowel sounds of the patient, which was accomplished and found to be normal.

In order to understand the significance of the standards of professional care required of the registered nurse in this case, the court believes it is significant to examine the medial situation of the patient on a post-mortem basis. The autopsy report confirmed the diagnosis of an "acute hemorrhagic cerebrovascular event." A microscopic examination of tissues allowed a further finding of a "localized vascular abnormality." The pathologist's conclusion was that "the most likely abnormality for this patient's age group and location of hemorrhage would be a saccular aneurysm rupture..."

The attending neurosurgeon at the time of the emergency proceedings testified by deposition. During his testimony, he opined that the time of origin of the hemorrhage was "... when she slouched forward in her chair, fell and was incontinent ..."[4] However, he raised questions as to the point in time during the span from 12:30 p.m. to 7:00 p.m. when she would have displayed significant neurological symptoms. He allowed that it could have taken some time for them to appear. "Her clot is so low in the brain and so midline in terms of the compression, that this woman will present without focal findings. This makes it even more rare. In other words, we have a patient who's thrown immediately into coma without any real lateralizing symptoms." His

_____

[4] Whether the doctor inadvertently used an incorrect term, whether he simply misunderstood the history or whether he was told an incorrect history, the facts are that the patient did not become incontinent until approximately 90 minutes after the incident in the psychologist's office. But it does display errors in medical history from lack of documentation by attending nurses.

conclusion injects the possibility that had the patient been regularly neurologically assessed, the symptoms may not have appeared for a period of time.

However, testimony by experts in the field of nursing make it unequivocally clear that signs were available that should have immediately put a clinical nurse on notice that the possibility of a neurological event had taken place. First, the importance of the demeanor of the patient in the psychologist's office when she complained of a severe headache, slowly collapsed to the floor, and vomited. Had this been known to medical staff, it should have immediately displayed a suspicion to require a neurological assessment. The incontinence and the total lack of response in being cleaned and moved around in the bed suggested more than a sedated, sleeping person. The stimuli created by the glucose test was a major indicator. Finally, and of significant importance, the loss of control of the vomiting action and the bowel action while in an unconscious state should have left no doubt of a serious situation occurring, or, at least, such a possibility that it needed to be ruled out.

The law regulating the practice of nursing in the State of Maine is found in Title 32 of the Maine Revised Statutes. The State Board of Nursing is charged with the protection of public health and welfare in the area of nursing service in order to safeguard the life and health of the people in this State. The Board is authorized to administer a licensing process to assure that those who practice professional nursing are qualified to practice. The practice of professional nursing means, among other things, the performance by a registered professional nurse in the diagnosis and treatment of human responses to actual or potential physical and emotional health problems and execution of the medical regimen as prescribed by a license physician. 32 M.R.S.A. 2102(2)(A).

9

"Diagnosis" in the context of nursing practice means that identification of and discrimination between physical and psychosocial signs and symptoms essential to effective execution and management of the nursing regimen. This diagnostic privilege is distinct from medical diagnosis.

32 M.R.S.A. § 2102(2)(A)(1).

"Human responses" means those signs, symptoms and processes that denote the individual's health needs or reaction to an actual or potential health problem.

32 M.R.S.A. § 2102(2)(A)(2).

Rules and regulations established by the State Board of Nursing pursuant to 32 M.R.S.A. § 2153-A(1) provides standards to be utilized by the State Board of Nursing in taking actions pursuant to its authorization under 32 M.R.S.A. § 2105-A, disciplinary actions which may result in suspension, revocation or denial of a license. The grounds for discipline are found in 32 M.R.S.A. § 2105-A(2). These provisions include, among other things, unprofessional conduct, 32 M.R.S.A. § 2105-A(2)(F), and violations of rules and regulations, 32 M.R.S.A. § 2105-A(2)(H). The definitions of unprofessional conduct are found in Chapter 4 of the Rules and Regulations of the Maine State Board of Nursing, § 3. In this present proceeding, the State Board of Nursing asks the court to revoke or suspend the registered nurse's license of the defendant for the following violations:

1.    **Incompetence – 32 M.R.S.A. § 2105-A(2)(E)(1)**

Engaged in conduct that evidences a lack of ability or fitness to discharge the duty owed by the licensee to a patient.

2.    **Incompetence - 32 M.R.S.A. § 2105-A(2)(E)(2)**

Engaged in conduct that evidences a lack of knowledge or inability to apply principles or skills to carry out the practice for which the licensee is licensed.

3.    **Unprofessional Conduct - 32 M.R.S.A. § 2105-A(2)(F)**

Engaged in conduct that violates a standard of professional behavior that has been established in the practice for which the license is issued.

4. **Unprofessional Conduct - 32 M.R.S.A. § 2105-A(2)(H) violation of 32 M.R.S.A. § 2105-A(2)(F)**

**Unprofessional Conduct, Board Rule: Chapter 4.3.**

Nursing behavior which fails to conform to legal standards and accepted standards of the nursing profession, and which could reflect adversely on the health and welfare of the public shall constitute unprofessional conduct and shall include, but not limited to, the following:

5. **Rule 4.3.B.**

Assuming duties and responsibilities within the practice of nursing without adequate preparation or when competency has not been maintained.

6. **Rule 4.3.F.**

Failing to take appropriate action or to follow policies and procedures in the practice situation designed to safeguard the patient.

7. **Rule 4.3.G.**

Abandoning or neglecting a patient requiring nursing care.

Abandonment of a patient is the termination of the nurse/patient relationship without the patient's consent or without first making arrangements for continuation of required nursing care by others.

Reasonable notification or request for alternative care of a patient to an attending physician or to a staff supervisor prior to termination of the relationship is sufficient to permit such termination . . .

The nurse/patient relationship begins when responsibility for nursing care of a patient is accepted by the nurse.

8. **Rule 4.3.H**

Negligently causing physical injury to a patient.

9. **Rule 4.3.K.**

Inaccurate recording, falsifying or altering a patient or healthcare provider records.

The applicable standards for the acceptable practice of a registered nurse are found in the American Nurses Association's Standards of Clinical Nursing Practice, 2nd Ed. 1998, "Criteria Based Job Description and Performance Standards For a Registered Nurse" by the MaineGeneral Medical Center, October, 1998, Lipincott Manual of Nursing Practice, 6th Ed., J.P. Lipincott Co. 1996 and "The Nursing Process," "Adult Physical Assessment, Neurological System, and Nursing Management of the Patient With An Altered State of Consciousness." All of these documents were available to nursing staff at MaineGeneral Medical Center.

The standards of the ANA require the nurse to collect patient health data by way of assessment, analyze the assessment data to determine a diagnosis, develop a plan of care that prescribes interventions to attain the expected outcome, implement the interventions, and evaluate the patient's progress. The standards of professional performance include systematically evaluating the quality and effectiveness of the nursing practice, evaluate the practice in relation to the standards, and to acquire and maintain current knowledge and competency in nursing practices. Standards of clinical nursing practice include both standard of care and standards of professional performance. The Nursing Process/Documentation Policy requires documentation of the Nursing Process. This policy maintains standards of assessment and documentation. Among other things, the nurse is responsible for the assessment and necessary update of the plan for care on unstable patients every shift until condition is stable. Nursing Standards of the MaineGeneral Medical Center provide the definition and description of the scope and conduct of nursing care to be provided by the nursing staff. The policy and procedures published utilize, among other references, the Lipincott manual.

The MGMC The procedure for neurological vital signs includes a purpose "to establish a standard systematic procedure for evaluating a patient's neurological status through assessment of level of unconsciousness, motor strength, vital signs and pupil signs." This procedure includes the Glasgow Coma Scale which standardizes an ever-increasing level of stimulus for

- the patient opening his or her eyes on their own

- opening when asked in a loud voice

- opening to painful stimuli only

- the patient does not open his or her eyes for any stimuli

It also contains standards of observation of motor response and verbal response.[5] It then lists four pages of procedures last revised and approved prior to this incident in April of 1998.

Lipincott describes the nursing process as assessment, nursing diagnosis, planning, implementation, and evaluation.

The MaineGeneral Medical Center utilizes a computer system for entry of certain types of documentation. It is a Waterville unit hospital-wide system. Matrix #2925 on that system provides the normal assessment parameters for a neurological system; Matrix #3845 provides the level of consciousness standards including the Glasgow Coma Scale; Matrix #3846, #3847 and #3848 provide additional neurological assessment standards for the clinical nurse on a unit.

In the final analysis, throughout the nursing process, it is expected that the professional nurse will be an "advocate" for patients constantly assessing their needs, requesting assistance when necessary, documenting their status, causing special

_____

[5] On that scale, which is routinely used, the circumstances of F.N. would have unequivocally indicated that she was in a coma.

13

documentation of unusual occurrences, and requesting physician or psychiatric assistance when deemed necessary.

Defendant came to MaineGeneral Medical Center, then known as Mid-Maine Medical Center, in March of 1987. She graduated from high school in 1966 and took a series of adult education courses through the years until receiving an Associate's Degree in Nursing at the University of Maine-Augusta in 1987. During the period of 1966 through 1973, with the exception of an 11-month period, she was employed as a laboratory technician at hospitals and clinical laboratories. At MGMC, she received performance evaluations conducted in conjunction with her supervisor from 1987 to 1998 which found her to meet expectations or exceed expectations in all areas. In July 1987 she successfully completed the Nursing Clinical Skills Program in Basic and Medical/Surgical Skills. In 1992 she completed MANDT System Intermediate Level Trainer Course in Managing Nonaggressive and Aggressive People. In her performance appraisal of May 1998, she exceeded the standards in "knowledge re: mental health; is ANA certified as a Mental Health Nurse, occasionally performs relief charge duties" and met the standards in other areas. She was found to be competent in the annual competency review.

While the defendant does not acknowledge entire responsibility for the tragic demise of F.N., she does accept her level of responsibility in the matter. When placed on probation as a result of this incident and participating in remedial training, including neurological assessments, she professed to have received medical information with which she had not been previously familiar or, had not remembered from earlier training. One element was the relationship of incontinence to cranial pressure. As a result of this remedial education and training and the procedures to which she was required to be subject through her probation, she now accepts her responsibility with

14

respect to documentation and realizes that she should have been more verbal to the medical doctor and not expected the charge nurse to do more of the intervention activity. She realizes she should have done regular neurological assessments. She acknowledges that she voluntarily surrendered her license pending this proceeding and that, if allowed to regain her license, she would need to take, as a minimum, the 12-week physical assessment course before reemployment. She described changes in procedure on the unit implemented after this incident including greater use of "focus notes."[6] Such focus notes are a part of the required policy of the hospital. She acknowledges they are a continuous entry as long as there is reassessment done to effectuate the changes necessary. Ms. Lanning testifies she would never, under any circumstances, allow anyone else to do her documentation. The defendant testifies she was aware of the resources available to the nurses on the unit. Finally, she indicates that as a result of her probationary reeducation, she would now be more aware of serious conditions resulting from lack of response.

During the course of her testimony, the court inquired of the defendant as to whether she had conducted neurological assessments in the years prior to March of 1999 and she responded in the affirmative. The court then asked her how many times she had done such assessments and she suggested they had been accomplished three or four times a year. The court then asked her what were the circumstances in which she did the assessments. The defendant testified that in all of those situations, the person had received an obvious trauma to the head such as falling or some other blow and she had carried on a continuous neurological assessment in each of those cases to assure that no brain damage had resulted. Finally, the court asked if she had ever encountered

---

[6] A "focus note" is a documentation of an event causing a call to the medical doctor.

a situation such as in March of 1999 where there was no obvious head trauma and a person assumed to be sleeping had gone into a coma. She answered in the negative.

The question before the court is not whether the defendant was responsible for the decease of F.N. or whether she should be disciplined for that result. The issue before the court is whether she was and is fit to be licensed as a registered professional nurse and, if not, whether there are conditions such that would provide a reasonable expectation in the court that she could be fit upon the satisfaction of certain conditions. In order to resolve those issues, the court must first address each and every allegation of grounds for revocation charged by the State Board of Nursing.

On March 12, 1999, did the defendant engage in conduct that evidenced a lack of ability or fitness to discharge the duty owed by her to F.N. or a lack of knowledge or inability to apply principles or skills to carry out the practice for which she was licensed? The answer is yes. If she was devoid of education or memory of education as to fail to recognize the relationship between certain physical symptoms and neurological abnormalities as would be expected by a nurse's diagnosis, she was not fit to discharge her duty and suffered from such a lack of knowledge to carry out the practice of the registered nurse. Her failure to be sensitive to a sense of advocacy for the patient and be suspicious of the circumstances, notwithstanding instructions from the psychiatrist and the medical doctor, questions her medical knowledge and fitness to discharge her duty to that patient.

On March 12, 1999, did the defendant violate a standard of professional behavior that had been established in the practice for which she was licensed? The answer is yes. She did not take appropriate action or follow policies and procedures in the practice situation designed to safeguard the patient. She proceeded on assumptions, rather than assessment data. She assumed the patient was asleep notwithstanding lack of

movement or response for almost seven hours. At no time did she assess the plaintiff's level of responsiveness.[7] She did not document the patient's activities.

Did she violate accepted standards of the nursing profession by inaccurate recording, falsifying or altering a patient or health care provider record? Yes, no recording is an inaccurate recording. The credibility of the addendum days after the fact is severely challenged. Further, the lack of recording for the interim period is not available to other staff or health care providers and lack of history significantly impairs the treatment plan process in the continuity of the nursing process.[8]

The court is not satisfied that the defendant assumed duties and responsibilities within the practice of nursing without adequate preparation or when competency had not been maintained. An examination of her records at the time of the incident did not display any lack of competency. While she lacked knowledge and fitness with respect to the particular circumstances, there is no evidence that she assumed duties and responsibility or was aware of that lack of competency. The court is further not satisfied that the defendant abandoned or neglected the patient or negligently caused physical injury. There is no evidence that Ms. Lanning ever terminated her relationship with F.N. or ever abandoned her responsibilities to the patient by refusing to provide nursing care. While there may have been an unacceptable lack of responsibility in understanding her relationship to F.N., whether or not she was specifically assigned to that patient by the charge nurse, abandonment is an intentional act and not present here. In addition, it is clear from the testimony of the neurosurgeon upon post-mortem analysis that there was a reasonable likelihood that the abnormal neurological manifestations would have been some time in the development based upon the rare

---

[7] Isn't that why they wake you up in the middle of the night to check vital signs?
[8] The lack of documentation in the present case may have played some role in the varying versions of history of the patient appearing in the records of various staff persons.

and unique nature of this ruptured aneurysm. That cannot meet the standard of negligence that it is more likely than not that Ms. Lanning caused the death of the patient and there is no evidence that she caused the hemorrhage from the aneurysm.

The Maine State Board of Nursing is the State regulatory agency charged with "protection of the public health and welfare in the area of nursing service." In order to carry out that authority, the Board requires a person to submit evidence that he or she is qualified to practice nursing and, through a licensing process, the Board assures the competency of a registered nurse. Through rules and regulations, the Board sets standards for competency and professional conduct. The Board is authorized to suspend or revoke a license if the individual is deemed to be incompetent in the practice for which he or she is licensed or has engaged in unprofessional conduct by violating a standard of professional behavior which has been established in the practice for which the licensee is licensed. In addition, the Board has the authority to warn, censure or reprimand a licensee found to be in violation of the rules, enter into a consent agreement for probation, to rehabilitate or educate the licensee, to accept the voluntary surrender of a license and impose terms and conditions for reinstatement that "insure protection of the public health and safety and serve to rehabilitate or educate the licensee," to modify or not renew a license, all in addition to suspension or revocation.

Webster's II New Riverside University Dictionary (1988) defines "competent" as "1. Properly qualified; capable. 2. Adequate for the stipulated purpose; sufficient." Except to the extent that a person intentionally and knowingly participates in the practice of nursing without sufficient competence, the purpose of regulation is to assure competence. To the extent a licensee engages in unprofessional conduct, the issue is whether the individual is otherwise competent or fit to practice nursing but should be

18

disciplined for the violation of standard of professional behavior. Therefore, the court must examine two purposes of the licensing law in its analysis of a proper disposition of this case.

The court has concluded that the defendant is fundamentally competent in nursing skills and has displayed those skills over a nine-year period by meeting the expected standards. There is no evidence of her lack of competence at other times outside of the circumstances of March 12, 1999.[9] While the defendant clearly exhibited lack of medical critical skills in March of 1999, there is no evidence of that lack of critical skills from previous records.

In the final analysis, the discipline imposed must fit the nature of the violations of standards committed by the defendant while the ultimate disposition of the license status must fit the particular circumstances of the defendant herself. Fundamental to this process is the philosophy of regulation of professionals to "protect the public from incompetent, drug impaired, mentally ill, or other persons who, if licensed, would pose a risk of harm to patients." *Senty v. Board of Osteophatic Examination & Registration*, 594 A.2d 1068 (Me. 1991). In considering the appropriate disciplinary action consistent with the circumstances of the violations, the court must keep in mind the appropriateness of the discipline as perceived by all other licensees in the field of nursing. A reasonable licensee could conclude that any set of circumstances of failure of competency or violation of standards which contributes in any way to harm to a patient should result in nothing less than a full revocation of license. Others would suggest that an educated and experienced person practicing in the profession who, but for lack of judgment for a

---

[9] The court is aware that the defendant was terminated from employment at the hospital for a subsequent incident. The court has heard Ms. Lanning's version of those circumstances. The evidence of that incident was not fully developed before this court and it does not believe it should be considered inasmuch as it is not alleged in the complaint.

19

limited area of medicine, is found to have violated the standards, is too valuable an asset to our health provider community to be simply removed without attempts at education and rehabilitation. Somewhere in that equation is an analysis whether the individual is capable of such education and rehabilitation as to be of value to the health care community and not a threat to the life and health of the people of this State.

Under the provisions of 10 M.R.S.A. § 8003(5)(A-1), the court, acting on behalf of the authority of the Maine State Board of Nursing, may suspend a license for up to 90 days for each violation of applicable laws, rules and conditions of licensure, which suspension may run concurrently or consecutively with any other suspension for a separate violation. The court also has authority to impose conditions of probation such as additional continuing education, mandatory professional supervision and any other conditions deemed appropriate by the governing board.

For her failure to retain competency in the area of neurological assessment, a violation of 32 M.R.S.A. 2105-A(2)(E), the court imposes a 90-day suspension. For assuming duties and responsibilities within the practice of nursing without adequate preparation and failing to follow policies and procedures in the hospital setting, the court imposes a concurrent 90-day suspension. For violating accepted standards of the nursing profession by failing to record and document the condition of the patient and the activities in which she was engaged with that patient, a violation of Rule 4.3K, the court imposes a consecutive 90-day suspension. This was a particularly egregious deviation from acceptable standards.

The court notes the voluntary surrender of defendant's license on April 24, 2000, and that she has not practiced as a registered nurse for almost three years. The defendant has clearly stated to the court that this circumstance would warrant additional continuing education were she to be reinstated. The court believes that

20

probation upon reinstatement is warranted with a condition of additional continuing education and professional supervision for a reasonable of time.

The entry will be

For the reasons stated herein, the court finds the defendant has violated provisions of 32 M.R.S.A. ch. 31 and rules and regulations of the Maine State Board of Nursing; the defendant did not maintain an acceptable level of competency in the nursing process and violated standards of professional conduct; the license of the defendant is SUSPENDED for two consecutive 90-day periods in accordance with statute; upon the conclusion of the suspension, the defendant is placed on probation for six months with the condition that she completes additional education to the satisfaction of the Maine State Board of Nursing and, if employed, to work under professional supervision acceptable to the Maine State Board of Nursing.

Dated: March 26, 2003

Donald H. Marden
Justice, Superior Court

21

STATE OF MAINE
  vs
PATRICIA E LANNING

SUPERIOR COURT
KENNEBEC, ss.
Docket No   AUGSC-AD-2002-00001

## DOCKET RECORD

Attorney: ELLIOTT EPSTEIN
          ISAACSON & RAYMOND
          PO BOX 891
          75 PARK STREET
          LEWISTON ME 04243-0891
          RETAINED 03/13/2002

State's Attorney: JOHN RICHARDS

Filing Document: COMPLAINT
Filing Date: 03/13/2002

Major Case Type: STATE BOARDS

## Charge(s)

## Docket Events:

03/15/2002 FILING DOCUMENT -  COMPLAINT FILED ON 03/13/2002

           NOTE -  PRIOR ENTRIES IN MANUAL DOCKET ENTERED ON 03/13/2002

03/19/2002 ORDER -  COURT ORDER ENTERED ON 03/11/2002
           NANCY  MILLS , SUPERIOR COURT CHIEF JUSTICE
           ORDER TRANSFERRING CASE TO KENNEBEC SUPERIOR COURT.  COPIES MAILED TO ATTYSOF RECORD.
03/28/2002 HEARING -  OTHER HEARING HELD ON 03/28/2002
           DONALD H MARDEN , JUSTICE
           TELEPHONE CONFERENCE HELD.  ENTRY WILL BE:  TERMS OF SECOND CIVIL PRETRIAL ORDER (2/7/02)
           REMAIN IN EFFECT.  CLERK WILL SET THE MATTER FOR SPECIAL    ASSIGNMENT DECEMBER 16, 17,
           18, 2002 AND ADVISE COUNSEL.  COPIES  MAILED TOATTYS OF RECORD.
12/19/2002 HEARING -  OTHER HEARING HELD ON 12/16/2002
           DONALD H MARDEN , JUSTICE
           Attorney:  ELLIOTT EPSTEIN
           DA:  RUTH MCNIFF         Reporter: KIMBERLY MCCULLOCH
           NON-JURY TRIAL WITH JACK RICHARDS, AAG FOR THE STATE. PARTIES MAKE OPENING STATEMENTS TO
           THE COURT. PLAINTIFF CALLS RICHARD THOMPSON, DENNIS WITHAM, SHIRLEY FRASIER AND BARBARA
           WHITEHEAD AS WITNESSES. CASE RECESSES AT 4:05 P.M.
12/19/2002 HEARING -  OTHER HEARING HELD ON 12/17/2002
           DONALD H MARDEN , JUSTICE
           Attorney:  ELLIOTT EPSTEIN
           DA:  RUTH MCNIFF         Reporter: KIMBERLY MCCULLOCH
           DAY 2 OF NON-JURY TRIAL. PLAINTIFF CONTINUES WITH TESTIMONY OF SANDRA LOCKLIN, STEVEN
           DIAZ, NANCY RUSHTON, MARCIA JONES AND ELIZABETH GILMOUR. DEFENDANT TAKES WITNESS, LISA
           SNOW OUT OF ORDER. CASE RECESSES AT 3:50 P.M.
12/19/2002 HEARING -  OTHER HEARING HELD ON 12/18/2002
           DONALD H MARDEN , JUSTICE
           Attorney:  ELLIOTT EPSTEIN
           DA:  RUTH MCNIFF         Reporter: KIMBERLY MCCULLOCH
           DAY 3 PLAINTIFF CONTINUES WITH TESTIMONY OF ELIZABETH GILMOUR. PLAINTIFF RESTS AT 11:45
           A.M. DEFT. MOVES FOR JUDGEMENT AS MATTER OF LAW. COURT DENIES MOTION. DEFEFENDANT CALLS
           PATRICIA LANNING AS A WITNESS. DEFT. RESTS AT 3:16 P.M. COURT ORDER THAT CLOSING ARGUMENTS
           MADE TO THE COURT BE WRITTEN. PLAINTIFF HAS UNTIL 2/1/03 TO FILE. DEFT. HAS UNTIL 2/15/03
           TO RESPOND. COURT TO TAKE MATTER UNDER ADVISEMENT.